WISE, Judge.[1]
The appellant, Dewey Donald Feather-ston, was convicted of two counts of criminal possession of a forged instrument in the second degree, a violation of § 18A-9-6, Ala.Code 1975. Featherston was sentenced to concurrent terms of four years’ imprisonment; however, the sentences were suspended and he was placed on four years’ supervised probation and was ordered to pay restitution.
The evidence elicited at trial tended to establish the following: The victim, William Campbell (“Mr. Campbell”), was an elderly man who lived alone. Mr. Campbell was a diabetic; his diabetes affected his legs and his vision. Although Mr. Campbell’s eyesight “wasn’t real good,” his mind was sharp.
Mr. Campbell was independent and insisted on living alone. He cared for himself, retrieved his daily mail, and maintained a checking account at AmSouth Bank to cover his regular expenses. His son, William P. Campbell (‘William”), ensured that Mr. Campbell’s basic needs were met. William checked on his father daily; he made sure that his father ate regularly, that he took his medicines, that he kept his regularly scheduled doctors’ appointments, and that he paid his bills. Because Mr. Campbell’s vision was poor, William assisted his father in paying his monthly bills. Once or twice a month, William would sit down with his father and review the bills that had arrived in the mail. William would make out the appropriate check, and his father would then sign the check. No one other than William ever assisted his father in writing checks.
Late in 1996, William experienced some health problems that required surgery. Because William would be hospitalized for several days, he needed someone to assist him in caring for his father. Around this time, William’s daughter, Lisa, arrived at her father’s home. Lisa was accompanied by Jimmy Featherston, whom she identified as her husband. Lisa and Jimmy had nowhere to stay, so William asked his daughter if she and Jimmy would stay with Mr. Campbell and see to his needs until William was out of the hospital. Because Lisa rarely came home for more than a week or two at a time, William believed that having the couple stay with Mr. Campbell would benefit everyone.
Upon William’s release from the hospital, he was able to resume his care of Mr. Campbell. However, Lisa and Jimmy showed no signs of leaving. William learned that while Lisa and Jimmy were staying with Mr. Campbell, he had bought them groceries and lent them money and let them use a truck. William suggested *211 that the couple should find a place of their own so that they and Mr. Campbell could have some privacy. In February 1997, Lisa and Jimmy left the area suddenly. William learned that they were gone when Mr. Campbell telephoned him and asked him to do some shopping for him because the couple had left.
Lisa and Jimmy’s abrupt departure from the area made William suspicious. When Mr. Campbell mentioned to William that he seemed to have lost or misplaced a book of checks, he became even more suspicious, and he suspected that money might be missing from his father’s checking account. William knew that as of October 1996, the date of the most recent bank statement he had reviewed for his father, Mr. Campbell had approximately $45,000 in the checking account. However, on February 26, 1997, when William took Mr. Campbell to one of the Decatur branches of AmSouth Bank to cash a check and to inquire about his account, a bank teller informed Mr. Campbell that his account balance was approximately $135. William immediately transferred money from another account into his father’s checking account so that he would have funds to pay his bills.
William knew that it was not possible for his father to have spent that amount of money on his day-to-day expenses in such a short period. William told bank personnel that he suspected someone of forging Mr. Campbell’s signature on a book of missing checks, and he requested copies of all checks that had been written for an amount in excess of $100. Bank officials told William that he and his father needed to file a report with the police; they did so. After they filed the police report with Investigator Mike Pettey of the Decatur Police Department, William and Mr. Campbell returned to AmSouth, where William assisted his father in completing a number of affidavits alleging that a forgery had occurred in his account. Mr. Campbell executed 25 forgery affidavits. The amounts of the forged checks ranged from $100 to $1,800. A total of $36,455 had been taken from Mr. Campbell’s account without his knowledge.
The customer service department of AmSouth Bank contacted Mike Smith, an investigator with AmSouth’s corporate security department, on February 26, 1997. He began an investigation into the forged checks. He discovered that 17 of the 25 forged checks had been written to the order of Donny Featherston, Jimmy Featherston’s brother. Smith learned that the checks had been cashed at branches of AmSouth Bank in Morgan County and nearby counties. He was able to obtain videotapes from two AmSouth banks in Morgan County on days that the forged checks were cashed, and he saw Donny Featherston cashing the checks. Donny Featherston cashed check number 3072 for $1,200 on January 2, 1997, and check number 3117 for $1,500 on February 3, 1997. Both checks were noted as being for “home repairs.” However, no repairs had been performed on Mr. Campbell’s residence. Only two of the 25 forged checks were cashed in Morgan County.
While Mike Smith was performing an internal bank investigation into the forged checks, Investigator Mike Pettey was conducting a criminal investigation into the matter. He obtained a list of the forged checks and the payees, and began attempting to locate the various payees. Given that 17 of the 25 forged checks were made out to Donny Featherston, Pettey was particularly interested in Featherston. He ran a driver’s license check and a criminal history check on Donny Featherston. Investigator Pettey learned that Donny Featherston had once been arrested by the Huntsville Police Department. As a result *212 of that arrest, Pettey was able to obtain a photograph of Donny Featherston, which he compared to the person shown cashing the checks on videotape, thus confirming that Donny Featherston was, in fact, the person who had cashed forged checks numbered 8072 and 8117.
In July 1997, approximately five months after he executed the forgery affidavits, Mr. Campbell died. The investigation, however, continued.
On September 25, 1997, Donny Feather-ston was arrested in Huntsville. He was charged with two counts of possession of a forged instrument in the second degree. Following his arrest, Investigator Pettey went to Huntsville and interviewed Feath-erston. Featherston gave Pettey a statement detailing his actions with regard to the two forged checks he had cashed in Morgan County. Featherston admitted cashing the two checks. The statement continued:
“I did not know Mr. William Campbell personally and was owed no money by Mr. Campbell for any reason. I came in possession of these two checks through my brother Jimmy Featherston and Lisa Campbell. Lisa Campbell was to be [sic] the granddaughter of William Campbell. I was somewhat questionable of Jimmy and Lisa when they came to me with the checks because I was aware of Jimmy’s past history and wouldn’t put it past Jimmy to have stolen the checks. Jimmy did, however, tell me that he had been doing work for Mr. Campbell and that he had received the checks from William Campbell’s secretary. I had since learned that the checks were to have been stolen by Jimmy and Lisa. I cashed the listed checks as well as several others on the William Campbell account as asked by Jimmy and Lisa. I would get $100.00 from Jimmy and Lisa for each of the checks I cashed. Each check on the Campbell account that I cashed were made payable to Donny Featherston and the majority of the checks that I did cash were cashed in the City of Decatur. There were other checks that I cashed for Jimmy and Lisa and they were cashed in the City of Madison and Huntsville. The way that I would usually get up with Jimmy and Lisa was for them to page me and I would call them back. Jimmy would say that he had a check he needed to cash and I would come to Decatur and pick him and sometimes Lisa [up] and we would go to the bank. Jimmy would sometimes make out the checks as we sat in the car. Sometimes the checks would already be made out.”
At trial, the State offered the testimony of several witnesses, including Mr. Campbell’s son, William, who testified that he was able to recognize his father’s signature and that the signature on checks 3072 and 3117 was not his father’s. The State also offered State’s Exhibits 7 and 8, the forgery affidavits executed by Mr. Campbell on February 26, 1997. Over Featherston’s objection, the trial court determined that the affidavits were admissible under the business records exception to the hearsay rule. The jury convicted Featherston of two counts of possession of a forged instrument in the second degree. This appeal followed.
The dispositive issue presented for our review is whether the trial court erred when it admitted State’s Exhibits 7 and 8, the forgery affidavits executed by Mr. Campbell on February 26, 1997, under the business records exception to the hearsay rule.
“ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(b), Ala.R.Evid. Hearsay is inad *213 missible unless it is admitted pursuant to a recognized exception. Rule 802, Ala. R.Evid. Rule 803(6), Ala.R.Evid., the business records exception to the hearsay rule, permits the admission of records of regularly conducted business activity, provided that certain requirements are met. That rule provides:
“A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term ‘business’ as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.”
“As a general rule, an affidavit is hearsay and, therefore, not admissible for the purpose of proving the truth of the matter stated in it.” Charles Gamble, McElroy’s Alabama Evidence § 260.01 (5th ed.1996). Thus, for an affidavit to be admissible it must fall within one of the exceptions of the hearsay rule. See Jordan v. City of Huntsville, 650 So.2d 591, 593 (Ala.Crim.App.1994). Our research reveals no Alabama caselaw addressing the specific issue before us today[2] — that is, whether forgery affidavits executed by an unavailable witness are admissible under the business records exception to the hearsay rule. Therefore, we have looked to other jurisdictions for guidance.
Our research reveals that several jurisdictions have addressed this issue. Indeed, the Florida courts faced virtually the same fact situation before us today in Johnson v. State, 633 So.2d 484 (Fla.Dist.Ct.App.1994). In Johnson, the defendant was convicted of grand theft, exploitation of an aged person, and forgery arising out of her forgery of checks drawn on the account of an elderly victim and her theft of the funds received upon presentation of the forged instruments. Before trial, the victim died. To prove that the victim’s name was forged and that she did not receive the proceeds from the checks, the prosecution offered affidavits to this effect, which the victim had signed before the defendant’s arrest. Over objection, the trial court ruled that the affidavits were admissible under the business records exception to the hearsay rule.
On appeal, the Florida District Court of Appeals reversed Johnson’s conviction, holding that because the information in the affidavits themselves also constituted hearsay, to be admissible that information must qualify under an exception. 633 So.2d at 484; see also Van Zant v. State, 372 So.2d *214 502 (Fla.Dist.Ct.App.1979) (where source of information contained in probable cause affidavit and sworn complaint was the homicide victim, and not the person who prepared such documents, such documents were hearsay containing hearsay; because the victim was unable to testify in court concerning the information contained in the affidavit, it was not admissible as evidence merely because it had been recorded in the regular course of business). Moreover, based on the circumstances, the Florida court rejected any claim that admission of the affidavits was harmless error. 633 So.2d at 485.
The Georgia courts have likewise rejected claims that affidavits stating that checks were forgeries were admissible as business records and holding that the affidavits were not memoranda or records of acts or events. In Adams v. State, 217 Ga.App. 706, 459 S.E.2d 182 (1995), the defendant was charged with numerous counts of forgery. On some counts, the witnesses testified in person that the defendant did not have the authority to sign the check at issue; in others, the prosecution’s evidence consisted of an affidavit to that effect. Reversing the forgery convictions obtained by use of affidavits, the court noted:
“Even though properly authenticated business records may be admitted in evidence in criminal trials as an exception to the hearsay rule (see OCGA § 24-3-14(b); Oldham v. State, [205 Ga. App. 268, 270, 422 S.E.2d 38], these affidavits were not business records because they were not memoranda or records of acts, transactions, occurrences, or events (see OCGA § 24—3—14(b)); Finch v. Caldwell, 155 Ga.App. 813, 815, 273 S.E.2d 216), and they contained inadmissible opinions and conclusions. Malcolm v. State, 263 Ga. 369, 370, 434 S.E.2d 479; Luke v. Spicer, 194 Ga.App. 183, 184, 390 S.E.2d 267; Finch v. Caldwell, supra. Moreover, the business record exception is an exception to the hearsay rule (Oldham, supra at 269, 422 S.E.2d 38), and not a general exception to the confrontation clause.
“We recognize that admission of evidence under exceptions to the hearsay rule necessarily does not implicate the confrontation clause (Higgs v. State, 256 Ga. 606, 608-609, 351 S.E.2d 448), but testimonial affidavits such as these do not satisfy the criteria for admission in evidence. Finch v. Caldwell, supra. Consequently, the trial court erred by admitting these affidavits.”
217 Ga.App. at 707-08, 459 S.E.2d at 183-84. See also Miller v. State, 266 Ga. 850, 853, 472 S.E.2d 74, 77-78 (1996).
Indiana Courts have also rejected claims that affidavits of forgery executed by individual account holders were admissible under the business records exception. In Stahl v. State, 686 N.E.2d 89 (Ind.1997), the defendant was convicted of fraud on a financial institution and of theft, both convictions arising out of his unauthorized use of another individual’s automatic teller machine (“ATM”) card. On appeal, Stahl argued that the trial court erred in admitting the affidavit of forgery executed by the ATM cardholder because the affidavit was inadmissible under the business records exception to the hearsay rule. The Supreme Court agreed, holding that because the cardholder who provided the affidavit was not in the business of doing so and because the bank official who procured the affidavit did not have first-hand knowledge of facts stated in the affidavit, the affidavit was inadmissible as a business record of the bank. 686 N.E.2d at 92. Accord Ground v. State, 702 N.E.2d 728, 731 (Ind.Ct.App.1998).
The federal courts have also addressed claims similar to the one before this Court *215 today. In United States v. Ismoila, 100 F.3d 380 (5th Cir.1996), the defendants defrauded various banks and credit-card companies by processing hundreds of fraudulent charges on stolen credit cards to obtain cash. They were charged with conspiracy to commit wire fraud, money laundering, and the use of unauthorized access devices; they were also charged with aiding and abetting wire fraud, money laundering, and the use of unauthorized access devices. At trial, the prosecution offered written affidavits from several hundred credit-card customers. The affidavits contained, generally, cardholders’ statements that their credit cards had been lost, stolen, or not received, or that their account bills contained unauthorized charges. Over objection, the affidavits were admitted into evidence. On appeal, the appellants argued that the affidavits were inadmissible because, they claimed, the affidavits contained hearsay, and therefore violated their Sixth Amendment right to confront witnesses.
The Fifth Circuit determined that the cardholders’ affidavits and letters were not admissible under the business records exception:
“The cardholders’ statements do not qualify as business records of the cardholders because the business records exception ‘applies only if the person who makes the statement “is himself acting in the regular course of business.” ’ Rock v. Huffco Gas & Oil Co., Inc., 922 F.2d 272, 279 (5th Cir.1991) (quoting Florida Canal Industries, Inc. v. Rambo, 537 F.2d 200, 202 (5th Cir.1976)). As the Appellants correctly point out, it is not the regular course of business for credit cardholders to fill out affidavits or otherwise give information to their banks regarding stolen credit cards. See United States v. Davis, 571 F.2d 1354, 1359 (5th Cir.1978).
“Second the statements are not admissible as business records of the issuing banks because of the double hearsay involved.
“ ‘Double hearsay exists when a business record is prepared by one employee from information supplied by another employee. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). However, if the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider’s statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have.’
United States v. Baker, 693 F.2d 183, 188 (D.C.Cir.1982) (citing United States v. Davis, 571 F.2d 1354 (5th Cir.1978)). In the present case, the cardholders— outsiders to the companies that generated the documents — were the sources of the information contained in the records. So although Fed.R.Evid. 803(6) provides an exception for one level of hearsay— that of the documents themselves created by the employee who recorded the cardholder statements — the sources of the information contained in the records were the cardholders, and their statements must fall within another hearsay exception to be admissible. See Baker, 693 F.2d at 188.
“The Government cites many cases that affirm the admission, under the business records exception, of a company’s business records containing statements provided by outsiders. These cases, however, all involve situations in *216 which the double hearsay problem was satisfied either by the use of multiple hearsay exceptions or because the outsider who provided the statements was also acting in the regular course of business. See, e.g., United States v. Goodchild, 25 F.3d 55, 60 (1st Cir.1994).”
100 F.3d at 392-93 (footnotes omitted). Although the Fifth Circuit determined that the defrauded cardholders’ affidavits were inadmissible under the business records exception, it did, nevertheless, hold that the affidavits were admissible under the residual exceptions to the hearsay rule, as set out in Rule 803(24), Fed.R.Evid.:
“Although the statements of the cardholders do not qualify as business records, both the written affidavits and the oral statements made to the bank personnel are admissible under the residual exceptions to the hearsay rule, Fed.R.Evid. 803(24) and 804(b)(5). The residual exceptions authorize the admission of hearsay statements having ‘circumstantial guarantees of trustworthiness’ equivalent to those of the other enumerated hearsay exceptions, as long as the trial court determines that the statements are sufficiently material, probative, and in the interests of justice. Fed.R.Evid. 803(24), 804(b)(5).
“... We thus believe that the affidavits of the cardholders and the oral statements made to the bank personnel exhibit a degree of reliability similar to that of the statements judged admissible in United States v. Simmons, 773 F.2d 1455, 1460 (4th Cir.1985) (holding that the admission, under Rule 803(24), of an ATF gun certification form that had been filled out and signed by a weapon manufacturer did not violate the Confrontation Clause because the form was highly reliable).”
100 F.3d at 393. The Alabama Rules of Evidence are patterned after the Federal Rules of Evidence. However, Rules 803 and 804, Ala.R.Evid., do not contain a corresponding residual exception. Indeed, the Advisory’s Committee’s Notes to Rule 803 specifically recognize this omission:
“It should be noted that these rules do not include what is known as a ‘residual’ or ‘catchall’ exception to the hearsay rule. See Fed.R.Evid. 803(24). The committee expresses no position as to whether the Alabama Supreme Court may expand the number of hearsay exceptions by decision. See Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir.1961).”
Although the Advisory Committee would prefer that any additional exceptions to the hearsay rule be accomplished under the Supreme Court’s rulemaking authority, rather than on a case-by-case basis, we believe that the Supreme Court may, nevertheless, elect to adopt a residual exception to Rule 803, Ala.R.Evid., on a case-by-case basis. Indeed, should the Court so choose, it could use this case to adopt such an exception. However, because this Court lacks the rulemaking authority of the Supreme Court, we are left with no choice other than to hold that the trial court erred in admitting State’s Exhibits 7 and 8 into evidence under the business records exception to the hearsay rule. Moreover, we cannot say that the trial court’s error was harmless. Mr. Campbell’s son testified that he recognized his father’s signature and that the signature on the checks was definitely not his father’s signature. This testimony constituted the State’s proof that the checks were forged. However, with the erroneous admission of the affidavit, the jury was given its only opportunity to examine the actual signature of the victim of the forgery, William Campbell, and to compare that signature with the signature on the forged checks. Thus, the admission of the affida *217 vit strengthened the State’s case. Under these circumstances, we are unable to say that admission of the affidavits did not injuriously affect the substantial rights of Featherston. Rule 45, Ala.R.App.P. See also Johnson v. State, 633 So.2d at 485; Ground v. State, 702 N.E.2d at 732.
Because we must reverse the trial court’s judgment based on this issue, we express no opinion on the other issues raised by Featherston. “ ‘Our decision not to address [the merits of] the remaining issues raised by the appellant should not be construed as an approval of the manner in which the trial was conducted in regard to those issues.’ ” Phillips v. State, 726 So.2d 292, 295 (Ala.Crim.App.1998) (quoting Fletcher v. State, 621 So.2d 1010, 1024 (Ala.Crim.App.1993)).
Based on the foregoing, the judgment of the trial court is reversed and this cause is remanded to the trial court for a new trial.
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB and BASCHAB, JJ., concur; SHAW, J., dissents, with opinion.

. This case was originally assigned to another judge on the Alabama Court of Criminal Appeals. It was reassigned to Judge Wise on January 16, 2001.

. The only case we located that has addressed a similar issue is Ex parte Frith, 526 So.2d 880, 882 (Ala.1987) (reversing a rape conviction because the trial court erred by admitting, under the business records exception, a psychiatrist’s letter written to a witness; the court held that the psychiatrist was not associated with the witness's "business" in any way, and, thus, that the letter was inadmissible). However, because the document admitted was a letter and not an affidavit Frith provides only marginal guidance. Frith also argued that admission of the letter violated his right to confront the witnesses against him. Just as in the present case, however, this issue was raised for the first time on appeal. Therefore, the Supreme Court declined to address Frith's claim. We likewise decline to address Featherston's claim that his confrontation rights were violated by admission of the affidavits.